Argued January 8, affirmed March 21, 1974

DICKEY ET AL, *Appellants, v.* BARNES ET AL,
*Defendants,* AND MOSSBERG ET UX,
*Respondents.*
519 P2d 1252

*Louis M. Giovanini,* Beaverton, argued the cause for appellants. With him on the brief was Henry Kane, Beaverton.

*Robert P. VanNatta,* St. Helens, argued the cause for respondents. On the brief were VanNatta & Peterson, St. Helens.

O'CONNELL, C. J.

This declaratory judgment proceeding was instituted by plaintiffs in an attempt to nullify a condominium development in Clatsop County, and for a decree declaring that the unit owners have an interest as determined by the court. The named defendants (with the exception of the City of Astoria and its named officers) are owners or purchasers of units in the condominium. The majority of these named defendants filed no appearance in the case. Several appeared in support of plaintiffs' request, as did the City of Astoria. Only the defendants Mossberg actively opposed plaintiffs' suit. The trial court denied plaintiffs relief and they appeal.

Plaintiffs Dickey and Michlitch are the original developers of an area known as "Blue Ridge of Astoria." Plaintiff Jeremiah is the successor in interest to these developers. This area was owned until 1966 by the United States government, and while so owned was developed with housing to serve the Tongue Point naval facility. The land at that time contained 102

housing units, mostly in the form of duplexes and triplexes. Prior to June 29, 1966, plaintiffs purchased this land from the General Services Administration under a contract of sale. On that date, the plaintiffs filed with the clerk for Clatsop County a "Declaration Submitting Real Estate to the Unit Ownership Law (condominium) of the State of Oregon." There is no dispute that in doing so plaintiffs intended to bring their development within the provisions of ORS 91.505 to 91.675, Oregon's condominium law. Apparently pursuant to ORS 91.530,[1] plaintiffs' declaration contained the following statement:

> "Each of the units presently contains a single-story frame structure; however, the units themselves are parcels of land, and the depiction of the structures on the floor plan is for purposes of identification only."

Plaintiffs described 102 units. Plaintiffs interpret the foregoing declaration as purporting to exclude structures from condominimum type ownership. No buildings were described as a part of the development.[2] Plaintiffs did file bylaws to control the organization and regulation of the condominium association and assigned specific percentages of common ownership which attached to each. Moreover, plaintiffs filed an engineering survey depicting "the layout of the units"

---

[1] ORS 91.530 provides, in part: "(1) A declaration shall contain: * * * * *

"(b) The name by which the property shall be known and a general description of each unit and the building or buildings, including the number of stories and basements of each building, the number of units and the principal materials of which they are constructed.

"(c) The unit designation, location, approximate area of each unit and any other data necessary for proper identification."

[2] See ORS 91.530 (1).

which it stated to be its "floor plans."[3] Plaintiffs then began to convey out unit interests. Defendants Mossberg purchased units 53 and 55, which comprised 2.26% of the association in July of 1966.

There was testimony to the effect that within two years after the filing of the declaration virtually all units had been conveyed. It is undisputed that during this time the association collected assessments from unit owners and caused substantial maintenance work to be performed on the area. It appears, however, that this success with the condominium project was short-lived. More serious difficulties arose when the title insurance companies refused to insure the title to property included in the declaration, having concluded that the condominium statute was not complied with and further, that a valid subdivision was not created because plaintiffs had not complied with Oregon subdivision law.[4]

Because of these and other deficiencies the lending institutions refused to lend money for the purchase of the units. As a result, Blue Ridge went into a slow but steady decline. Defendants Mossberg refused to concede that these inconveniences are the cause of Blue Ridge's decline. Rather, they assert that plaintiffs have failed to pay approximately $50,000 over the past five

---

[3] ORS 91.540 (2) provides: "Floor plans of a building described in a declaration shall be recorded simultaneously with the declaration. The floor plans shall show the layout of each unit in a building including the unit designation, location and dimensions of each unit and the common elements to which each has access. There shall be attached to the floor plans a statement of the registered architect or registered professional engineer who prepared the floor plans certifying that the plans fully and accurately depict the layout of the units and floors of the building, and the date construction of the building was completed."

[4] ORS Chapter 92.

years in monthly assessments on the units under their ownership and that the resulting lack of association funds has led to the deterioration of properties.[9] Defendants also assert that this suit is an attempt by plaintiffs to avoid paying this money.

In a memorandum opinion the trial court denied relief, holding that "the plaintiffs should be estopped to deny the validity of the transaction with the Mossbergs and, furthermore, they do not come into court with clean hands."

■ We agree that the relief sought should be denied, but for somewhat different reasons. As we have pointed out, it is clear that the declaration was filed for the purpose of bringing the Blue Ridge development within the provisions of Oregon's condominium law (ORS 91.505 et seq.). Therefore, assuming that the declaration did not conform to the statutory requirements in some respects, these deficiencies, if any, would constitute a mistake in the transaction between the parties, thus making the instrument eligible for reformation in equity. Whether there are any obstacles to the granting of relief by way of reformation, we are unable to determine from the record because plaintiffs elected to take the opposite course of action and attempted to vitiate rather than reform whatever they may have created.

Reformation, if appropriate, would of course preserve the plan which all of the parties presumably intended to create. A decree nullifying the declaration would result in defeating the original intention of the parties and would leave them with interests in the property markedly different than those for which they

---

[9] The bylaws called for monthly payments of $5.00 per unit for upkeep expenses.

bargained. That being the case, we think that plaintiffs should have first explored the availability of relief by way of reformation.

■ The evidence adduced to prove the invalidity of the declaration was rather imprecise but as we understand it, plaintiffs base their case upon three alleged deficiencies in the declaration. First, it is contended that at the time the declaration was filed, plaintiffs were merely purchasers under a land sale contract and that the legal title was vested in the federal government. They argue that the word "owner" in ORS 91.525 means "legal owner" and thus the declaration is of no effect because it was filed by an unqualified party. This argument does not appeal to us. As we have noted, plaintiffs acquired legal title after the filing of the declaration. Assuming that the statute requires the declarant to have legal title, that requirement is now satisfied. We can see no reason for refusing to recognize it as satisfying the requirement of the statement, even if it is assumed that legal title is essential to perfect a condominium under the statute.

■ Next it is contended that the declaration is defective because, according to plaintiffs' interpretation, it purports to create a condominium in land alone and not a structure thereon, whereas the statute describes condominium unit interests in terms of both land and structure. Assuming without deciding that this contention is sound, we see no impediment to reforming it to conform to the requirement of the statute.

Plaintiffs also seem to regard as inadequate the description of the units in other respects. As defendants point out, this defect, if it exists, can be cured by a survey of the property.

The character of the defects recited by plaintiffs are such as to lend themselves readily to correction and cure. Unless there are impediments of which we are not aware, it would seem that reformation would provide the most appropriate remedy, considering the circumstances of this case.

The decree of the trial court is affirmed.

HOWELL, J., specially concurring.

I concur in the result reached in the majority opinion that plaintiffs' declaratory judgment action should be dismissed. I believe that the suggestion in the opinion that reformation might be an available remedy for plaintiffs should be omitted.

Plaintiffs' whole problem centers around the fact their condominium development was defectively organized because of legal errors made by out-of-state counsel. In effect, plaintiffs are inviting this court to advise them what to do to correct the errors. I would decline the invitation to suggest possible remedies and leave that subject to the professional skill of counsel. A reformation suit is not before us, and therefore I do not have any idea whether the facts would justify a conclusion that a mistake was made and whether reformation is or is not a proper remedy to pursue.

McALLISTER, J., and TONGUE, J., join in this specially concurring opinion.